# MEACHAM v. HALEY et al.—270 S. W. (2d) 503.

Eastern Section. April 20, 1954.

Petition for Certiorari denied by Supreme Court, July 23, 1954.

John Ross Scott and Noone, Tanner & Noone, all of Chattanooga, for complainant.

Wilkerson & Wilkerson, Curry & Harris, Folts, Brammer, Bishop & Thomas, Goins & Gammon, all of Chattanooga, for defendants.

HOWARD, J. The original bill herein was filed by Ellis K. Meacham, the duly appointed Trustee in Bankruptcy of the Dr. Pepper Bottling Company, Inc., of Chattanooga, against the defendants, Fred M. Haley, A. S. Johnston, et al., seeking a decree under circumstances hereinafter appearing. The facts are undisputed but the inferences, conclusions and applications of the law are not. Inasmuch as Haley and Johnston are the principals involved, only casual reference will hereinafter be made to the other defendants.

On July 26, 1944, Fred M. Haley and wife, Elsie M. Haley, J. C. Smith and wife, Bessie B. Smith, and A. S.

Johnston entered into a written contract, the pertinent provisions of which may be summarized as follows:

The Haleys and Smiths agreed to sell to Johnston all of the capital stock of Dr. Pepper Bottling Company (hereinafter referred to as "the old corporation") for $240,000, on terms of $60,000 cash, and thirteen notes of Johnston, maturing as follows:

$16,375.81 on January 15, 1945

$ 8,000 on January 15, 1945

$ 5,624.19 on April 15, 1945

10 notes for $15,000 each, maturing over a period of 10 years, payable in monthly installments of $1,250 each, first installment due on September 1, 1944.

The 10 notes for $15,000 each could be reduced each year as low as $11,250, and payments made only to that extent, if during that 12 months period, the number of cases sold by the corporation multiplied by 7½¢ per case, did not equal the sum of $15,000. The contract further provided that Johnston would surrender the charter of the old corporation, acquire all the assets thereof through dissolution, form a new corporation (Dr. Pepper Bottling Company, Inc.), transfer all of the assets of the old corporation to the new corporation in return for all of the new corporation's stock, and its 13 notes identical with the 13 notes given by Johnston to Haley, et al., these notes to be substituted for the notes originally given by Johnston, and Johnston to pledge the stock of the new corporation to Haley, et al., as collateral for the payment of the notes.

It appears that the steps outlined in the contract were executed and all of the notes were paid as and when due, up to and including the monthly payment of $1,250 in October, 1947, i. e., for a period of three and one-fourth

years. In February, 1948, Clay Church purchased all of the stock of the new corporation. On August 18, 1948, the new corporation filed its petition in bankruptcy, and the complainant in the instant case, Ellis K. Meacham, was duly appointed trustee.

After carefully reading the record, we find that the late Chancellor Ziegler dealt fully with the determinative questions involved, and we adopt and concur in his opinion, which reads as follows:

"This controversy in some of its phases was heard in the local bankruptcy and U. S. District Courts, in which a clear and succinct statement of facts was made by Judge Darr, the following portion of which is adopted herein, to be followed by supplementary statement and comment:

" 'The Dr. Pepper Bottling Company was organized on January 31, 1936, the stock of the same being owned by Fred M. Haley, Elsie M. Haley, J. C. Smith and Bessie B. Smith. On July 15, 1944, the above holders of the capital stock sold the same to A. S. Johnston for the sum of $240,000.00 and the assumption of other liabilities in the sum of $19,023.96, $60,000.00 being cash, and the balance being thirteen notes in the sum of $180,000.00, signed personally by A. S. Johnston.

" 'A new corporation was formed on August 1, 1944, and the Haley interest agreed to cancel the personal notes of A. S. Johnston and accept notes of the new corporation and to hold all of the stock as collateral, and all of the assets of the old corporation were transferred to the new corporation.

" 'The net assets of the old corporation as shown by the balance sheet in 1944, were $51,340.06. Fifteen days later, or on August 1, 1944, these were raised to $73,-

494.22. The new corporation showed assets of the old corporation amounting to $73,494.22 and good will of $166,505.78, which together amounted to the purchase price of $240,000.00 and the capital stock of the new corporation was issued as paid-up capital stock.

" 'In 1948, the corporation that Johnston formed was sold to Clay Church. At that time the series of notes as issued by the new corporation to the Haley interest had been reduced to $101,250.00. When this trade was made between the corporation and Church, the Haley interest further agreed to cancel or forgive $31,250.00 of the amount that the corporation owed them as evidenced by a series of notes. Church, at the time of the purchase, paid $5,000.00 cash to Haley. This left a balance of $65,000.00 due the Haley interest on the original trade, and this controversy is over this indebtedness. The Haley interest actually received on their original $240,-000.00 sale $143,750.00. This amount, plus the $31,250.00 canceled or forgiven by the Haley interest, left the balance of $65,000.00 and the Trustee has filed objections to the same.

" 'The net assets of the old corporation at the time of the sale, as shown by the balance sheet, was $40,049.23 instead of $51,340.06 as reported by the Referee, his statement of the net assets apparently included $11,-290.83, the figure at which the capital stock was then carried.

" 'In connection with the sale of the stock of the old corporation to Mr. Johnston, a written contract was entered into between the Haleys and Johnston, specifying the terms and conditions of sale and describing the thirteen notes which were to be executed by Johnston for the $180,000.00 balance of purchase money. To this contract

was attached a financial statement or balance sheet as of July 15, 1944, which the Haleys warranted to correctly reflect the condition of the old corporation. This statement contained no asset item of "good will".

" 'The new corporation had substantially the same name as the old and had authorized capital of 500 shares no par value. At the time of the organization of the new corporation Mr. Johnston owed the Haleys $180,000.00 for the stock of the old corporation. The corporate minutes show that immediately after the organization of the new corporation, in compliance with the sales contract Mr. Johnston submitted to the first Board of Directors a proposal in effect to transfer to the corporation all the assets which he had received in the liquidation of the old company, in consideration of the whole of its capital stock and in addition to the corporation's thirteen notes aggregating $180,000.00 made payable to the Haleys.

" 'The Board of Directors accepted the proposal, and the stock was issued to Mr. Johnston and his nominees as fully paid stock. The corporation executed the thirteen notes payable to the Haleys, which were delivered to the Haleys in cancellation of the Johnston notes of like amounts. The first note was for $16,375.81, maturing January 15, 1945; another for $8,000.00 payable January 15, 1945; and another for $5,624.19 payable April 15, 1945, and ten notes for $15,000.00 each maturing over a period of ten years in monthly installments of $1,250.00 the first installment payable September 1, 1944.

" 'In February, 1948, Mr. Clay Church acquired all the stock of the corporation. At that time the Haley notes had been reduced by payments aggregating $78,750.00; and from the balance due of $101,250.00, the Haleys

agreed to forgive or remit $31,250.00. Mr. Church paid $5,000.00 which was credited, and new corporate notes for $65,000.00 were given in renewal of the balance due the Haleys. It is for this balance that claim is filed.

" 'Fifteen days after the organization of the new corporation the assets were appreciated by an independent appraisal so as to change the net value of the assets transferred from the old corporation from $50,049.23 to $73,494.22. The Haley notes of $180,000.00 were then reflected as liabilities and the assets were built up by the entry of a corresponding amount under the head of 'good will'.

" 'The Trustee objected to the claim on the grounds that there was no consideration to the bankrupt for the indebtedness, that it had been created by an ultra vires act of the corporation and generally that the bankrupt estate was not indebted to claimants, at least until all other creditors were satisfied.

" 'The Haleys insisted that it was a valid corporation obligation, created in a legal manner at a time when the corporation was amply solvent, and was a just and enforceable obligation.

" 'The referee sustained the objections and disallowed the claim to the extent of deferring it to the claims of all other creditors.'

"On the foregoing statement of undisputed facts, unusually widely divergent interpretations are placed by counsel for the parties. Counsel for complainant insists, either explicitly or implicitly that the transactions, detailed in the foregoing statement reveal a diabolical scheme of chicanery, comprised of an intermixture of a corporate juggling, fiscal shenanigans and legal legerdemain.

"Defendants insist that all of the transactions disclosed were perfectly legitimate, legally and morally; that any departure in the mechanics of the transaction from traditional practices stemmed from a perfectly legitimate plan devised by highly competent and reputable accountants and lawyers, to minimize the burden of federal income taxation on the parties to the transaction.

"To determine the issue between these contending positions of the parties brief consideration of the various transactions involved will be given seriatim, as though these transactions had not been covered by an overall contract between the individuals at the time of the original sales contract since the validity or invalidity of the various transactions complained of cannot be affected because they were done pursuant to an overall contract.

"The first transaction was the sale of the stock in the Dr. Pepper Bottling Company by defendants Haley and Smith to defendant Johnston. It is wholly immaterial to the creditors of the corporation as to the fair value of the stock in proportion to its selling price. This was a matter that concerned only the sellers and the buyer.

"After acquisition by Johnston of all the corporate stock of the company, he had a perfect right legally and morally to surrender the corporate charter, the result of which was to vest title to the corporate property in him, subject to the rights of the creditors of the corporation at the time the charter was surrendered. Johnston might have operated the bottling plant as an individual or he could have sold the assets to some other person or to some other corporation. However, he elected to form a new corporation and sell the assets which he held individually to a new corporation which he had organized. When the new corporation was formed, it, of course, had

no assets. The only way it could get assets would be by gift or by the sale of its capital stock or by the purchase of assets on credit, or by a combination of two or three of these methods. As a matter of fact, it acquired the assets from Johnston by the exchange of its capital stock and the execution of notes to Haley and Smith in the amount of $180,000.00. The new corporation had a legal right to sell its capital stock or exchange it for property and it had a right to buy assets and execute its notes therefor, and in the absence of fraud, the transactions would seem to be perfectly legitimate.

"Fraud, of course, would invalidate this or any other transaction by which any complaining party was injured. Fraud can be established by three methods: (1) by proving actual fraudulent intent, (2) by proving such inadequate consideration in a contract as to shock the conscience of the Court, thus constituting fraud, or (3) by showing that the transaction was without fair consideration therefore constituting statutory fraud as defined in Code Section 7274.

"Counsel for complainant does not, and in view of the record, could not insist seriously that defendant Johnston was actuated by any fraudulent intent.

"Was the consideration for the transfer of the corporate stock and the issuance of the notes of the new corporation so conscience shockingly inadequate as to constitute fraud? The new corporation, for a consideration of $180,000.00 in notes, received all the assets of the old corporation for which defendant Johnston had paid $240,000.00. True, the new corporation issued all its authorized no par value stock in addition to the notes for the assets, but, in my opinion, the issuance of the stock could have no particular significance to the creditors. If

the assets were worth only $180,000.00, it would mean that the stock issued had no real value. If the assets were worth $240,000.00 which Johnston was to pay for the stock in the old company, then the stock in the new corporation would be worth $60,000.00: this is the amount defendant Johnston had invested in the enterprise. Insofar as the creditors are concerned, it seems to me they could not complain that the capital stock was issued to defendant Johnston. The creditors would not be concerned with who owned the stock. In other words to prove that the company received fair consideration for the obligation of the notes which it gave, it would be necessary to show that the assets were worth only $180,000.00—not $240,000.00. The creditors are not concerned as to whether the stock is worth $60,000.00 or nothing. Since the strategic question is were the assets of the company worth the $180,000.00, profitable consideration might be given to the original transaction whereby the defendant Johnston agreed to pay $240,000.-00 for the stock in the old corporation. Was this transaction supported by fair consideration? Fair consideration cannot be determined with the exactitude such as a tradesman uses in balancing merchandise against a known weight on the other side of the scales. A transaction, to be free of fraud should be honest and free from suspicion but inadequacy is not sufficient to establish fraud. Myers v. Fults, 124 Iowa 437, 100 N. W. 351.

"While the term 'fair consideration' so far as my research has disclosed has not been judicially defined with exactitude, I think that 'fair consideration' should be of a value within the range of the high and low estimates of value, placed thereon by reasonably intelligent men who have had experience in and who know something about

the business in which the property valued is used. What did the men in the bottling industry consider the fair value of the assets of the old corporation at the time its entire stock was acquired by Johnston? Johnston, who was an experienced bottler, thought that it was worth the $240,000.00. He stated that he could have sold it for an amount in excess of this. Haley testified that he had other offers, that he considered the sale price fair and that he could have sold the property at a comparable price to that received from Johnston. The judgment of Johnston and Haley as to the fair value of the assets was backed up by three considerations: (1) According to the 'rule of thumb', which seems to have been generally followed by bottlers at that time in valuing bottling plants, whereby the price was contingent upon the number of cases the bottlers sold per annum, the assets were worth more than $240,000.00; (2) the representative of the parent Dr. Pepper Company, after thorough investigation, approved the sale and, of course, that company would not want any of its bottlers to be unduly burdened with financial obligations that the assets would not justify, and (3) more persuasive than either of these items, the experienced Dr. Pepper Bottler of Rome, Georgia, Mr. G. H. McSpadden, actually executed a contract of purchase and put up the money for that portion of the bottling rights of the company located in Georgia counties at a value in approximate ratio to the purchase price that had been paid by Mr. Johnston for the stock. Thus, four people, the parties themselves, Mr. Ralph Powers, the representative of the parent company and Mr. G. H. McSpadden, the Rome Dr. Pepper Bottler, are all of the opinion that the assets were reasonably worth $240,000.00. From this testimony, which is not refuted

by any witness purporting to know anything about the bottling business I would not feel myself justified in finding that a fair value of the assets was less than the obligation assumed by the new corporation. With this finding as to fair value, in my opinion, the question as to whether or not the company was rendered insolvent is immaterial. However, it appears from the testimony of Mr. Leonard Barker, upon cross examination, that the company was not insolvent within the sense of having total liabilities in excess of its total sales value.

"Retrospectively, it appears that the assets of the old corporation were not worth the price paid for the stock by Mr. Johnston, nor the lesser price paid Johnston for these same assets by the new corporation. However, at the time of the transaction, no one knew what the future would hold and reasonable men in a position to know agreed on value. Dr. Pepper Bottlers at that time seem to have been divided into two classes—the priests and the prophets. The priests looking to the past and the prophets looking to the future. During the period of prosperity brought about by war time restrictions on sugar etc., Mr. Haley never lost sight of the past when competition was strong and distribution was limited. Mr. Johnston, not having been in the business so long, and conscious of the present prosperity of the company, was looking to and had confidence in the future. Only future events could determine that the priests rather than the prophets were correct, but this does not prove, in my opinion, that the property was not worth what was paid for it at the time.

"Most Chattanoogans have heard, have been greatly interested in the purchase for a very small consideration, of all the bottling rights in the Coca Cola Company by

three Chattanoogans, Messrs. Whitehead, Thomas and Lupton. They were then the prophets in that industry and the Candlers were the priests. The prophets in that transaction have been fabulously prosperous to the third and fourth generations. If future developments had been the measure of value in that transaction, the Candlers later could have set aside the transaction on the ground that the consideration was so grossly inadequate as to shock the conscience of any court. However, at the time of the transaction, the consideration was evidently thought fair by the parties thereto: just as in this transaction, the consideration was thought to be fair by the parties thereto.

"One or two other factors relied on by complainant in asserting fraud might be given a word of notice. Complainant insists that the differential in the value of the assets as carried on the books of the old company and the value of these same assets as carried on the books of the new company, indicated fraud; but I do not so conclude. * * * I think, as a matter of general knowledge, many companies in business to'day which were established several years ago when costs were much lower than today and have been taking allowable depreciation for tax purposes, now carry the physical assets of the companies on the books at depreciated values far below their reasonable market value, certainly the new company would have a right to carry the assets on its books at the purchase price.

"Much stress is laid by counsel for complainant upon the fact that the notes from the new corporation were made payable to defendants Haley and Smith, insisting that the new corporation could not obligate itself to pay the debt of another. It is certainly a sound proposition of

law that a corporation cannot legally bind itself to pay the debt of another. The old corporation could not have bound itself legally to pay Haley and Smith for the stock purchased by Johnston. The old company had all the assets and there would have been no consideration for its agreement to pay a note to Johnston or to Haley and Smith. The new corporation had no assets; it had to buy them. It had a right to exchange its capital stock and to execute its notes for the assets which it received from Johnston. It seems to me it is elemental Hornbookish law that "A." can make a valid contract with "B", binding "B" to pay "C". On the assumption that this is correct I abandon the hypothetical and take the actual. "J" (Johnston) could make a valid contract with "H" and "S" (Haley and Smith). As I understand this transaction, the new company was not paying the debt of Johnston but was paying its own debt for assets which it received from Johnston and it could have been bound to Johnston or his assigns.

"If Haley and Smith had owned the Dr. Pepper Bottling Company as individuals and had sold the assets to Johnston as an individual and Johnston had paid $60,000.00 and issued his notes to them for $180,000.00, without any thought on the part of the seller or the buyer of organizing a new corporation, then, Mr. Johnston later decided to incorporate the business and had transferred the assets which he held individually to the new company which made him notes for $180,000.00, the same amount for which the new company herein made to Haley and Smith, and had he endorsed these notes to Haley and Smith, I doubt if anyone would have or could have successfully raised any question. And, in essence, the transactions as thus hypothetically reconstructed, are indis-

tinguishable from the transactions with which we are herein concerned.

"Much is said about and considerable stress is laid on the item of 'good will', which was carried on the books of the new company. As hereinbefore indicated, it is my opinion that the assets between a willing seller and a willing buyer at the time of the sale, were worth the $240,000.00; then as a bookkeeping matter, the difference between the actual value of the tangible assets and the value of the total assets, being the same as the selling price, would have to be accounted for in some manner. As I understand it, this is customarily done by setting up an item of 'good will' on the books. 'Good will' is somewhat an elastic or uncertain term but there is discussed in the record an illustration of one item of 'good will'. The Dr. Pepper Bottling Company, with the approval of the parent company, could have sold to Mr. McSpadden its bottling rights in the Georgia counties which was included in its territory and which apparently could have no tangible value since its franchise with the parent company was cancelable. However, it did have some value because of the disinclination of the parent company to cancel the franchise without cause. This value must have been included in the item of 'good will'.

"One final word on the subject of fraud. If anyone perpetrated fraud in this case it was the lawyers and accountants who acted in the original sales transaction and whose advice was understandably followed by the contracting parties. These lawyers and accountants would have done and if anyone were defrauded, it was the Federal Government in the matter of income taxes. Surely many devices of similar character are practiced by business men to minimize taxes. Certainly the govern-

ment is familiar with these transactions and until the Federal Courts hold transactions such as the one herein involved to be fraudulent in a tax suit, I would not feel justified in so holding.

"For the foregoing reasons, I am of the opinion that fraud, either actual or constructive has not been practiced in this case and the complainant is not entitled to recover. Having found that there is no fraud, either actual or constructive involved in the transaction, I do not think it necessary to pass on other points raised in the pleadings.

"Complainant's bill will be dismissed."

The complainant as well as the defendants, the Haleys and the Smiths, have assigned errors here insisting that the proceedings in the Bankruptcy Court were conclusive in their favor; that by reason of the rulings of the Bankruptcy Court, the matters now urged are res adjudicata, and that the Chancellor, who pretermitted this question, erred in refusing to so hold. These defendants rely upon Rule 13, of the Federal Rules of Civil Procedure, 28 U.S.CA., the pertinent parts of which read as follows:

"(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction, except that such a claim need not be so stated if at the time the action was commenced the claim was the subject of another pending action.

"(b) Permissive Counterclaims. A pleading may

state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.

"(c) Counterclaim Exceeding Opposing Claim. A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party.

\*     \*     \*     \*     \*     \*

"(f) Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment."

█ The applicability of the Federal Rules of Civil Procedure to proceedings in bankruptcy seems to be well settled, for in Collier on Bankruptcy, 14th Ed., it says:

"The applicability of the Rules in all phases of the bankruptcy proceedings, as well as independent suits in aid thereof, has been upheld in more cases than we can enumerate here. And the applicability extends to matters before the referee as well as to those before the judge." Vol. 1, Sec. 2.81, p. 359.

"Where a set-off, counterclaim or recoupment is asserted in a federal district court sitting at law or in equity, the pleading and practice will be governed by Federal Rule 13. In cases where the set-off, counterclaim or recoupment is raised in the bankruptcy proceedings, Federal Rule 13 will also apply by virtue of General Order 37 [11 U.S.C.A. following section 53], so long as the Rule is not inconsistent

with the Act or the General Orders. It should be noted that for procedural purposes under Rule 13, the term 'counterclaim' includes both set-off, counterclaim and recoupment. 'Compulsory' counterclaims under the Rule denote those claims arising out of the same transaction as that sued on. 'Permissive' counterclaims cover those claims, including set-offs, arising from a different transaction or occurrence than the plaintiff's cause of action.'' Vol. 4, Sec. 68.21, pp. 790, 791.

█ Thus, it appears that a Referee in Bankruptcy not only has jurisdiction to grant affirmative relief against a creditor who has filed an unsecured claim, but that it is compulsory for him to do so where a counterclaim, as here, arises out of the same transaction or occurrence as the original claim. See also 6. Am. Jur., Sec. 524, p. 857.

Under the circumstances, the complainant having failed to assert his counterclaim in the Bankruptcy Court, should he now be permitted to recover in this case? We think not under authorities hereinafter cited.

In Moore's Federal Practice, 2nd Ed., it says:

"While neither Equity Rule 30 nor the present Rule expressly provides that failure to assert a compulsory counterclaim will be deemed to preclude its later assertion, such result was reached under the Equity Rule, and has been reached under Rule 13 in accordance with similar reasoning, i. e., that the principle of res judicata applies to all issues that should have been raised, even though omitted.'' Vol. 3, Sec. 13.12, pps. 27, 28.

In Florance v. Kresge, 4 Cir., 93 F. (2d) 784, 786, a similar question was before the U. S. Circuit Court of

Appeals, in which Judge Parker, speaking for the Court, said:

"We agree with the learned District Judge that the court below had jurisdiction to adjudicate the rights of the parties with respect to the claims asserted by the receivers and trustee against Kresge. The latter had made himself a party to the cause, both by filing an unsecured claim with the referee and by filing an intervening petition with the court asking that moneys in the hands of the receivers be turned over to him. Both claims related to his contract with bankrupt for the subletting of the property; and the claims asserted by the trustee and receivers were counterclaims arising out of the same contract. We see no reason why the court of bankruptcy should not pass upon the claims in favor of the bankrupt estate and set them off against the claims filed against the estate and its receivers; and, under the recent decision of the Supreme Court in Alexander v. Hillman, 296 U.S. 222, 56 S. Ct. 204, 209, 80 L. Ed. 192, we see no reason why the court, which is a court of equity even though exercising special statutory powers, should not proceed to render judgment against Kresge for any balance found to be due by him."

While the rule seems to be settled that proceedings in a Bankruptcy Court are res adjudicata, Adcock v. New Crystal Ice Co., 144 Tenn. 511, 234 S.W. 336; 6 Am. Jur. 512, p. 848, the rule is also well established that a former judgment extends not only to matters actually litigated, but also to all other matters which could have been litigated therein. Gibson's Suits in Chancery, 4th Ed., Sec. 329; Pile v. Pile, 134 Tenn. 370, 183 S.W.

1004; Jordan v. Johns, 168 Tenn. 525, 79 S.W. (2d) 798; Parkes v. Clift, 77 Tenn. 524; Peeler v. Norris, 12 Tenn. 331; Sale v. Eichberg, 105 Tenn. 333, 59 S.W. 1020, 52 L.R.A. 894; Knight v. Atkisson, 2 Tenn. Ch. 384.

In Jordan v. Johns, supra, our Supreme Court said [168 Tenn. 525, 79 S.W. (2d) 801]:

"It is settled law that, as between the same parties, in the same capacities, and touching the same subject-matter, the estoppel of a former judgment or decree is conclusive, not only as to matters actually put in issue, but equally so as to those which, by due diligence on the part of the litigant, or those charged with the management of his case, might have been put in issue in the pleadings filed in the former suit. * * *"

██ Inasmuch as the matters affecting the Haleys and the Smiths (the other defendants not being parties to the bankruptcy proceedings), arose out of the same transaction, to-wit: the contract of July 26, 1944, and were such as could have been adjudicated in the Bankruptcy Court under Rule 13 (a) of the Federal Rules of Civil Procedure, and the complainant having failed to adjudicate said matters in that Court, we think that he is now estopped to adjudicate said matters in the Courts of this State.

The decree below will be affirmed at complainant's costs.

McAmis, P. J., and Hale, J., concur.